**(101 South. 718)**

**No. 25608.**

## MENARD v. KLINGER.

(March 10, 1924. Rehearing Denied by Whole
Court Nov. 3, 1924.)

*(Syllabus by Editorial Staff.)*

1. **Partnership ⬅328(1)—Burden on defendant partner to show that plaintiff copartner acquiesced in prices placed on partnership stock.**

Where, after dissolution of fur trading partnership, defendant, a former partner, bid in partnership furs at auction, for default of purchasers, at prices fixed by himself, *held*, in suit by copartner for accounting, that burden was on defendant to show that plaintiff authorized and acquiesced in prices fixed.

2. **Partnership ⬅328(3)—That partner acquiesced in prices at which partnership property was bid in not shown.**

In suit, after dissolution, by one partner against another, to account for furs belonging to partnership, and bid in by defendant at prices fixed by himself, evidence *held* not to show that plaintiff authorized or acquiesced in prices fixed.

3. **Partnership·⬅282—Duty of partner after dissolution to dispose of furs at best prices obtainable.**

Where defendant partner, after dissolution sold furs belonging to the firm, it was his duty to dispose of them at best prices obtainable, and not to speculate for greater profits at late partner's risk.

4. **Partnership ⬅282—Right of recovery by partner on accounting for furs purchased by copartner, stated.**

Where stock of partnership furs was offered at auction, and bid in by defendant partner, plaintiff's right of recovery on accounting was such sum as covered his proportion of net profits had furs been sold at bona fide prices bid, or offered on market when auctioned at first sale after dissolution.

St. Paul, J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Suit by Paul H. Menard against Samuel Klinger. Judgment for defendant in recon-vention, and plaintiff appeals. Judgment set aside, and case remanded, with directions.

Joseph Harris Brewer, of New Orleans, for appellant.

J. D. Dresner and Henry Mooney, both of New Orleans, for appellee.

By Division B, composed of Justices DAWKINS, LAND, and LECHE.

DAWKINS, J. On December 17, 1919, plaintiff and Klinger's Umbrella Manufacturing Company entered into a partnership agreement for the purchase and sale of green furs and hides. The defendant agreed to furnish the "capital necessary for the purposes of the business," and plaintiff was to "devote his entire time and attention" thereto, which latter stipulation on the part of plaintiff was declared to be "of the essence of this contract. * * *" The arrangement was for the season of 1919–1920, which closed, under the statute permitting trapping in this state, on March 15, 1920. However, on December 29, 1919, or about 12 days after the contract was signed, defendant peremptorily declined to furnish any more money, and the partnership ended, except for the purpose of selling the stock on hand and liquidating its affairs.

The parties had done business on a similar basis the year before, and the results had been mutually satisfactory.

The reason given by defendant for not carrying out the contract was that the market had risen so rapidly as to become dangerous, and he feared it might break at any time with disastrous results to the partnership.

The method of marketing the furs was to ship them to fur exchanges in St. Louis and New York, and there offer them on stated sale days at public auction. Small quantities may have been disposed of at private sale to dealers or manufacturers, but the bulk were sold through the exchanges.

Plaintiff was an experienced fur man, in that he had for several years engaged in pur-

chasing the skins from trappers, either on salary or commission, while defendant knew nothing of the business, except such knowledge as he had gained from operations of the previous season. In making sales the year before, minimum prices were set upon the different kinds and grades of skins, which, if not bid at the auction, the goods were bought in for account of the owner, who simply paid the commission and expenses of the exchange. The prices set the year before were agreed upon by plaintiff and defendant, with the judgment of the former controlling because of his practical experience.

At the sales which took place from January to April, 1920, defendant wired to the exchanges certain minimum prices which the hides, with minor exceptions, failed to bring, and they were bought in the name of S. Klinger (defendant) at those figures.

Under the original partnership contract, plaintiff and the Klinger Umbrella Manufacturing Company were to divide the profits and losses in the proportion of one-third to the former and two-thirds to the latter. But on April 9, 1920, the plaintiff and defendant, S. Klinger (not Klinger's Umbrella Manufacturing Company) signed a document, the terms of which were as follows:

"Following contract is agreed between Mr. S. Klinger and P. H. Menard; that the profits from the furs 1919–1920 season be based on 40 per cent. for Mr. P. H. Menard and 60 per cent. for Mr. Klinger.

"This contract supersedes the previous contract in which Mr. Menard was to receive one-third of net profits and Mr. Klinger two-thirds of the net profits.

"Mr. Menard also acknowledges receipt of $2,000 (two thousand dollars) on account, based on the above contract.

"Balance of settlement to be made as soon as the furs are sold, but not later than November, 1920."

The fur market continued to rise until the latter days of March, 1920, when it suddenly broke, and rapidly declined, with the result that many dealers were forced into bankruptcy, and no auction sales were held from perhaps April and May for more than a year. The consequences were, that instead of realizing a profit of approximately $18,000 (about 100 per cent.) upon their investment, as would have been the case had the stock been sold at the sales of January and February, 1920, the partnership made a net profit of less than $4,000.

Plaintiff sued for an accounting, and claimed as his share of the net profits $5,333.78, taking the position that defendant was bound to account to the partnership upon the basis of the prices at which the furs were bid in by him, at the sales of January and February, 1920, for the reason that the partnership had been dissolved as of December 29, 1919, and Klinger no longer had any authority to purchase for the firm.

Defendant first excepted upon the ground that the petition and exhibits, particularly the contract of partnership, disclosed that the firm was composed of plaintiff and another partnership (the Klinger Umbrella Manufacturing Company) instead of defendant individually. The exception was overruled and an answer filed, admitting the formation and operation of the partnership during the time alleged, but averring that the furs had been handled and marketed in the same manner as was done the previous year; that plaintiff fixed the minimum prices, and defendant bought the furs in for the firm account; that they were finally sold to the best advantage and at a profit of $3,280.74; that plaintiff had already received the sum of $2,062.60, which exceeded his share by $750.30; and defendant prayed judgment in reconvention for that sum.

After trial on the merits, the court below rejected plaintiff's demand and gave judgment for defendant in reconvention for the amount claimed $750.30. Plaintiff appealed.

## Opinion.

Defendant has not answered the appeal, and hence the case is before us on the merits only.

Plaintiff contends, as a legal proposition, that Klinger, after dissolution of the partnership December 29, 1919, was without power or authority to bind it or him in the purchases made at the January and February sales, and must therefore be held to have bought for himself and to owe the partnership an accounting on that basis. On the other hand, although denying this legal consequence, defendant insists that there was, as a matter of fact, a positive and definite understanding between the parties that these prices should be set, and if not reached, the furs were to be bid in for the firm as was done for the season of 1918–1919.

The record does not contain the lower judge's reasons for judgment, but it is asserted in brief by defendant and not denied by plaintiff that the facts were resolved in defendant's favor; that is, that plaintiff did fix the price limits and agree that Klinger should buy the furs in at those figures for the partnership. Of course, if this were true, then it would be unnecessary to decide the question of law propounded by plaintiff, for parties capable of contracting have the right to make any agreement not contrary to law, which they may desire, and there would have been sufficient consideration in the better price which each hoped to receive for the hides in the future.

We have not hurriedly formed a conclusion on the question as to whether plaintiff did or did not name the prices to be set upon the furs and agree, if not reached, that they be bought in for the firm. Plaintiff's story appears straightforward and has the ring of truth; but he finds himself as a witness arrayed alone against the defendant and his daughter, the latter having been the bookkeeper and custodian of the firm's records.

Plaintiff asserts that after defendant refused to advance any more money for the business on December 29, just 12 days after the contract was signed, and at a time when the trapping season had 2½ months yet to run, he was highly disappointed and wished to have the firm's affairs liquidated as promptly as possible; that a few days before the first winter sales were to be held in January, he went into the office of defendant and discussed the question of prices; that defendant insisted they be fixed at from 20 to 25 per cent. higher than he (plaintiff) thought advisable to insure a sale; and that as a result, he left the defendant with the understanding that his (Menard's) figures would be used; that he thought this had been done, and never knew any different until many months afterwards; that, when he was able to obtain exchange catalogues and account sales, they showed that defendant had used his own high prices, which prevented the furs selling; but that, if his figures had been used, the market was such that in every instance the stock would have been sold.

On the other hand, defendant and his daughter assert with equal emphasis that plaintiff (who concededly was the practical fur man and better able to judge of such matters) named the very prices that were used. Yet, there are inconsistencies in their testimony which tend to affect its dependability. For instance, defendant testified that he had no conversation with Mr. Menard (plaintiff) after his refusal to advance any more money on December 29th, until the January sales, and, in the very next breath, says that plaintiff fixed the prices "during the month of January." Recognizing this discrepancy, his counsel on redirect examination attempted to have him straighten it out as follows:

"By Mr. Mooney:

"Q. Now, Mr. Klinger, I want you to pay particular attention to a seeming contradiction in your testimony to which Mr. Brewer (coun-

sel for plaintiff) was good enough to call your attention. You testified on direct examination that Mr. Menard called at your place of business and suggested the prices at which the furs 'were, to be bid in at New York. You testified to that?

"A. Yes, sir.

"Q. You said that occurred in January?

"A. Yes, sir.

"Q. In answer to Mr. Brewer's question, you said from December 29th until April you never had any conversation with Mr. Menard. How do you reconcile those two statements?

"A. After the limits were placed, then I didn't see him.

"Q. Do you mean to say you didn't have any talk with him from December; what do you mean to say; how is the court to understand your testimony?

"A. I had no business transaction; but he came on friendly calls.

"Q. Did you or did you not have any conversation with him in the month of January in regard to the prices at which these furs were to be protected?

"A. Absolutely. I would not undertake it upon myself because I was green in the business.

"Q. And I understand your testimony—if I am wrong correct me—that you had no further business discussions with Mr. Menard after that?

"A. Yes, after the limits were placed.

"Q. And that is what you meant to say?

"A. Yes, sir."

Without quoting in detail the testimony of Miss Klinger, it appears to be as much confused and inconsistent as that of her father. She, too, swore once or twice that Menard had not been in the office, or that her father had had no conversation with him in the office from December 29th until the January sales, yet she insisted that plaintiff had fixed the prices, which she noted at the moment, and immediately wrote and sent telegrams in her father's name, instructing the fur exchanges accordingly. All of these messages are dated in January, and she later said the conversations which she heard must have been in December. Neither of these two witnesses attempt to go into detail, or to mention any other 'circumstances to fortify their bare assertion that Menard fixed the prices

and agreed that the furs were to be bought in by Klinger if they were not reached. Viewed upon the cold record, to the judicial mind, they make very poor witnesses to say the least.

However, when we read plaintiff's statement of what occurred, as heretofore noted, it sounds very plausible. It is as follows:

"Q. Did you at any time authorize Mr. Klinger to place a limit on those furs or to hold them beyond the sales of the winter of 1920?

"A. No, sir. I wish to explain this to make it clear to the court. Can I do it?

"Q. Yes; proceed.

"A. On December 29, 1919, Mr. Klinger refused to continue operating and broke his contract and immediately ordered all of the furs back which were shipped to the various auction sales, giving up the store and discharging the employees, and he said, "No argument, I won't go a step further, not a dollar more,' and shortly after, some time in the month of January, I went to Mr. Klinger's office, the sale was about to take place, and I told Mr. Klinger the market was advancing continually and asked him, 'Have you placed a limit on those goods?' He told me, 'Yes.' I said, 'What limit have you placed on the goods,' and he said to me, 'I have placed a limit of $10 on the minks, $10 on the raccoons, $2 on the opossums, and $1.75 on the muskrats.' I then told Mr. Klinger, I said, 'Mr. Klinger, you don't want the goods sold, you have placed a prohibitive limit on these goods, and it should be cut, and I want the goods sold as long as you broke your contract, and I want a settlement.' He argued with me, and I said to Mr. Klinger, 'You got mighty brave in the last two weeks; you want to exact the highest prices. The goods won't bring those prices.' Before leaving him, he asked me, 'What limit do you want to place on the goods?' I said, 'Cut the limit on the raccoons to $7, on the minks to $8, and the opossums to $1.50, on the muskrats reduce that to $1.25.' He still protested it was too low. I told him then, 'Mr. Klinger, how do you expect $10 for raccoons that cost $3.25, $10 for minks which cost us $4.42, $2 for opossums that cost us 94 cents, and $1.75 for rats that cost us 74½ cents?' I told him that there was no such profits made in the fur business. I said, 'The prices have advanced so much now that the market may break at any moment. We should sell our goods at those prices where we would make a handsome profit.' Mr. Klinger left me under the impression that he would do so, and I was under that impression until October, 1920.

MENARD v. KLINGER

"Q. Mr. Menard, did you at any time authorize Mr. Klinger to put limits on those furs or to have them adjudicated to himself for joint account at the auction sales, or did you insist upon a liquidation and settlement according to contract?

"A. I wanted the goods sold at once in the winter sale, to get a settlement, and I wanted what was coming to me, and I wanted a statement of it.

"Q. Did you so inform Mr. Klinger?

"A. Yes, sir."

It is admitted that the fur market was advancing at that time (December 29th) by leaps and bounds, and human nature is such that, under such circumstances, it is very hard to resist the temptation to gamble for still higher prices. This is constantly illustrated by the fate of the uninitiated in the future market; whereas the experienced dealer or speculator more consistently takes a reasonable profit and "runs for cover."

Defendant had already stopped the outlay of capital, because of the wild market, and thereby reasonably assured himself against loss upon his investment. (By the time the second agreement or memorandum was signed April 9, 1920, he had actually drawn against the furs more than the firm had invested.) If he had continued, of course, higher prices would have had to be paid to the trappers. But as matters stood on December 29th, the gamble, as to stock on hand, it appeared, would be merely at the risk of profits.

In such circumstances, what would have been the natural tendency of the parties? Plaintiff was experienced in the business and knew its dangerous phases. He had expected to do a large business (in fact had already purchased in 12 days about $20,000 worth of furs), and had been precipitately shut off by defendant before the undertaking was hardly commenced. It was but natural that he should want to liquidate the business and receive his share of the proceeds.

156 LA.—35

With regard to when the furs were to be disposed of, the partnership contract provides as follows:

"It is further understood and agreed between the parties that such furs as may be bought either by the said Menard or the said Klinger's Umbrella Manufacturing Co., or any of the partners of said company, shall be disposed of not later than November 1, 1920, at which time the profits or losses shall be ascertained and apportioned as hereinabove provided. It is well understood that, if the market conditions prove favorable prior to November 1, 1920, all furs which are subject of this contract shall be disposed of before November 1, 1920, and settlement shall be made at such time for all profits or losses."

Incidentally, it also contained a provision that Menard should devote "his exclusive time for the 3 months ending March 15, 1920," to the business, "and upon breach thereof by the said Menard all credit which may be due him shall revert to the said Klinger's Umbrella Manufacturing Company, as liquidated damages." This was a very harsh stipulation, in so far as plaintiff was concerned, because it was, as has been seen, stipulated that the profits should be divided at the end of operations and sale of the stock. No similar penalty was provided for defendant's failure to furnish the capital, and he proceeded to violate the agreement in a very short time.

These circumstances are mentioned at this time for the purpose of illustrating the one-sided character of the relation and the thoroughness with which defendant retained control of the situation. And it was also further fortified by the fact that defendant dealt with the partnership property in his own name, in so far as marketing the furs, etc., were concerned, neither plaintiff's name nor that of the partnership appearing in the transactions with the fur exchanges, but only that of S. Klinger. The latter course, however, was with the knowledge of plaintiff, and presumably with his consent, about in

the same fashion and perhaps for the same reason that he had agreed to forfeit all interest or profit in the business if he failed to devote his time exclusively thereto; that is, defendant had the money, and, if Menard was to have the privilege and chance of earning a larger return than the salary which he had received when working for others, he must submit to the terms offered him. From all of which it would seem that defendant was not so completely dependent upon plaintiff as to the wisdom and policy of the business, and particularly as to the prices which the stock should bring, as he would have it believed from his testimony.

Nothing appears in the contract of partnership about the furs being marketed in the manner as was done, but it was stipulated that they should be sold at least by November 1, 1920, and before that time "if the market conditions proved favorable." It is conceded that, for the previous season, the parties did agree upon prices, and the furs were handled in the same manner, as contended for in this case by defendant. The market did reach a very favorable condition in January and February, 1920, and, if the figures, which plaintiff claims to have suggested and asserts he thought defendant had named, had been set, the stock would have been disposed of at a large profit. Taking the situation as it was, eliminating for the present any question of fixing price limits, if, in view of the terms of the contract that the furs should be sold before November 1st, defendant, having entire control in the sense that they were held at the exchanges in his name and subject to his orders, he had arbitrarily refused to sell and sought to speculate at the firm's risk, and the market had broken as it did; what, if any recourse, would plaintiff have had?

So long as the partnership continues, the rule of responsibility of a partner is well stated in 30 Cyc. p. 453, verbo "Partnership," as follows:

"While losses which are attributable to mere errors of judgment of a partner as distinguished from recklessness or bad faith are to be borne by the firm and not exclusively by him, as just stated, yet when losses are caused by a partner's acts, which amount to a breach of the partnership stipulation, or which are beyond the scope of the firm business and not assented to or ratified by his copartners, or which are characterized by bad faith toward them, the losses must be borne by him alone. The same rule is ordinarily applied to losses from adventures embarked in by a partner against his copartners' protests, as well as to those due to his positive misconduct."

After dissolution, the same authority (volume 30, p. 659) correctly states the law as follows:

"The dissolution of a partnership terminates those powers of the partners which are implied from the partnership relation, except those which are necessary to the winding up of the business. In other cases a partner, after dissolution duly notified, has the power of binding his former partner only when actual authority therefor has been conferred upon him. Moreover, he is bound to observe the utmost good faith toward his late partners in all matters connected with the settlement of the firm affairs."

[1-3] We think, therefore, that the burden was upon defendant to prove that plaintiff authorized or acquiesced in the fixing of the very high prices which were placed upon the partnership stock, and that he has failed to discharge that burden by a fair preponderance of the evidence. In the absence of such agreement, it was his duty to dispose of the furs at the best price obtainable, and not to speculate for greater profits at the risk of his late partner.

[4] On the other hand, we do not think plaintiff entitled to recover of defendant on the basis of the prices actually bid by the latter for the furs, but only such sum as would cover his proportion of the net profits

had the furs been sold at the bona fide prices which were bid or offered on the market when the stocks were auctioned in St. Louis and New York at the first sales after the partnership was dissolved. In other words, each and every lot should have been permitted to sell for the best bona fide bid offered when they were placed on the market.

The record does not contain sufficient information to enable us to determine what these prices were and it will be necessary to remand the case for that purpose, and in order to ascertain and adjust the accounts between the parties upon the question of expenses of the partnership.

For the reasons assigned, the judgment appealed from is set aside, and this case is remanded with instructions to the lower court to hear and determine the prices at which the furs should have been sold, as well as for the adjustment of accounts between the parties, all according to the views hereinabove expressed, and as the law provides.

### On Rehearing.

ROGERS, J. A re-examination of the record in this case, assisted therein by the able arguments and briefs of counsel, and with particular reference to the errors complained of in the application for a rehearing, has confirmed us in the correctness of the conclusions of law and fact set forth in the original opinion herein.

Realizing that it would be to the interest of all parties to end the litigation in the present proceeding, we have given serious consideration to the earnest efforts of counsel for plaintiff to show by facts and figures from the record as it now stands that this court, if it could not render judgment for the amount sued for, was yet in a position to render judgment for a definite sum. However, we have been unable to completely reconcile his figures and conclusions with the record, and we feel that any judgment we might render would be an approximation based purely on guesswork. In these circumstances we have concluded that the decree rendered in connection with the original opinion is the only decree that can be rendered on the present record.

It is therefore ordered that the opinion and decree herein rendered by this court on the 10th day of March, 1924, be now reinstated and made final.

ST. PAUL, J., dissents.